WEST END PARK COMPANY *et al.* v. MITCHELL.

No. 8559. August 17, 1932. Rehearing denied September 17, 1932.

*Tye, Thomson & Tye,* for plaintiff in error.
*George G. Finch,* contra.

Russell, C. J. This case has heretofore been considered by this court. *Mitchell* v. *West End Park Co.,* 171 *Ga.* 878 (156 S. E. 888). Many of the facts are there so fully set forth as to make a repetition of them unnecessary. On the former trial the judge directed a verdict establishing a first lien in favor of the West End Park Company under its loan deeds, upon the proceeds of the sale of the two lots which were in the hands of a receiver. "To this direction and judgment Mrs. Mitchell excepted, for the reason that her loan deeds constituted a first lien upon said funds, and that her loan deeds were entitled to priority over those of said company. Creel made a motion for direction of a verdict in his favor, establishing the amount of his claim as a first lien on the proceeds in the hands of the receiver; and to the refusal of the court to direct such verdict Mrs. Mitchell excepted upon the ground that the lien of Creel was superior in dignity to the loan deeds of said company, and that she had been subrogated to Creel's lien under the agreement between him and her above set out." We held that "Where the owner of lots in a subdivision conveyed two of them by deed to a purchaser, and simultaneously took from the latter a deed to each lot to secure a balance of the purchase-money, the title of the vendor to the lots embraced in these security deeds would generally be superior to any liens existing against the buyer at the time, or subsequently obtained against him." We held, however, that an exception to the general rule existed in this case, and where the security deeds contained an agreement between the owner and the purchaser whereby the latter was to erect a residence on each lot within six months from date, and the owner agreed to subordinate the outstanding notes for the purchase-money to a lien to secure a first loan upon the residence and lot, not to exceed 60 per cent. of the appraised value (provided, that if the residence was not completed prior to six months time from the date of the agreement, then the

owner was to be automatically released from its agreement to so subordinate); and where the purchaser, with the knowledge and consent of the owner procured from a lender a temporary loan of $2500 on each lot to enable the purchaser to erect dwelling-houses, from which $2500 the initial purchase-money payment of $250 of each lot was paid the owner, and the balance of the loan was used in paying for labor and material in building such houses, the lien of the lender under her security deeds was superior to the lien of the owner under its security deeds to secure the purchase-money, although the purchaser failed to complete the dwelling on each lot. We also held that a senior grantee in a security deed has an unquestionable right to waive his priority of lien in favor of a person who advances money to the vendor therein and has taken a junior security deed to enable a purchaser of the lot to improve the property conveyed to him, "the enhanced value of the property being sufficient consideration to sustain such waiver." We also held: "A grantee in a senior security deed may be estopped to assert the priority of his lien as against a grantee in a subsequent security deed, when it would be unconscionable to enforce the security of the former to the prejudice of the subsequent encumbrancer. . . Without any agreement, there may be facts and circumstances which indicate an intention to make one of two security deeds recorded at the same time prior to the other." This court on the former appearance of this case not only stated the foregoing well-settled general principles of law, but it made certain specific rulings which fixed the law of this case, unless the pleadings and evidence were essentially and substantially changed upon a subsequent investigation and trial. Especially applicable to the case before us, the court held that "The right of the lender to enforce the liens of her loan deeds in preference to the liens of the company under its security deeds does not depend upon the contract between the purchaser and the company, which is set out in each of its security deeds; but the lender is undertaking to enforce her liens under her contract with the purchaser, which was authorized by the company, and from which the company derived substantial payments on the purchase-money of each of these lots."

On the day this case was tried the second time, Mrs. Mitchell tendered and filed, over objections, an amendment to her intervention, alleging that her loan deeds had been transferred to the Credit

Investment Co., with the legal title to remain in intervenor with the beneficial interest to be in the Credit Investment Co., praying that the case proceed in the name of intervenor for the use of the Credit Investment Co. Upon the trial, Mrs. Mitchell introduced in evidence, over objections, a statement of the evidence adduced upon the previous trial of the case. This statement was agreed to by attorneys for the parties and used in lieu of a transcript of the evidence in bringing the case to the Supreme Court after the first trial. The objections offered were: that said paper was not an agreed statement of facts; that it was never contemplated to be used in a jury trial; that, properly construed, it had nothing to do with this case at this time, as it was merely for temporary use to go up to the Supreme Court after the former trial of this case; that the paper in question was prepared by the attorneys for Mrs. Mitchell, and, if there is any doubt of its meaning, should be construed against them; that it was not intended as a statement of ultimate facts but merely as a statement of the evidence that had been introduced in the former trial. In support of its objections the defendant offered the following evidence as to the execution of said agreed statement: 1st. The entry on the back of said paper designating it "agreed statement of the evidence." 2d. The bill of exceptions prepared by Mrs. Mitchell's counsel when the case went to the Supreme Court formerly, in which, in designating the portions of the record necessary to be sent to the Supreme Court, this paper was designated as "an agreed statement of the evidence." Also, letter from George Finch, counsel for Mrs. Mitchell, to W. D. Thomson, counsel for West End Park Co., enclosing statement proposed to be used in lieu of brief of evidence, for approval of Finch; two letters from Thomson to Finch, making changes in the statement, the last of which contained his approval thereof; the following letter from Thomson to Finch, written on May 7, 1931, after the decision in 171 *Ga.* 878: "This is to advise you that any agreements or stipulations as to the evidence in the above-stated case, which were entered into by me at the last trial, are hereby revoked and annulled, and will not be recognized in the retrial of this case; and I am giving you this notice in order that you may be prepared to prove the case without relying upon any of these stipulations when it is reached for trial on May 25th." The court overruled the objections and admitted the statement, holding it "admissible sub-

ject to explanation or rebuttal." Plaintiff in error says it was injured and prejudiced by the action of the court in so far as it permitted the introduction of that part of the statement reading as follows: "That the cash payment of $250 on each lot, which Black made to the West End Park Co., was a part of the proceeds of Mrs. Ella Mitchell's loans to Black, which loans were understood to be temporary loans and were to mature in 3 months and to be taken up and paid off out of the proceeds of the permanent loan provided for upon the completion of the house; that all of the balance of the loans of Mrs. Mitchell went to pay laborers and materialmen for improving the lots in question," because this might give the jury the impression that the West End Park Co. had thereby admitted that it knew, at the time it took the cash payment on its lots, that Black had borrowed the money and executed loan deeds to Mrs. Mitchell, and might lead them to infer that the West End Park Co. had consented or agreed with Black or with Mrs. Mitchell that said loans from her might be made and said loan deeds given to her; and further might lead them to infer that the West End Park Co. thereby admitted that it knew, at the time of the sale of said lots, that Black did not have money with which to pay for the erection of the houses, and that he had borrowed or would borrow the money from Mrs. Mitchell, and had used or would use it for the payment of labor and material, whereas, as plaintiff in error contends, it knew nothing at that time concerning the loan from Mrs. Mitchell, and it was not intended to admit, by approving said agreed statement of the evidence, that it had known or agreed in any way to the making of said loans by Mrs. Mitchell to Black.

After the introduction by the plaintiff of the statement referred to above, the defendant introduced Ira Everett, who testified: "I am in the real-estate business. On the 9th day of January, 1929, I was connected with F. T. & George J. Morris, as a salesman of real estate. I had listed with me at that time some property of the West End Park Land Company. I negotiated a sale of two of those lots to one Elvy Black. I did not take him into the office of the West End Park Company. I just carried them a written proposition. So far as I know, they did not at that time meet Mr. Black. When I submitted that written proposition to them, it was accepted by the president of that company in writing. Black did not come to their office and get the sales contract. I carried Black's

copy to him. I did not tell the West End Park Land Company, or any of its officers, about the financial condition of Black or his ability to build houses, or his necessity to borrow money. . . So far as I know, through any information conveyed by me, neither the West End Park Land Co. nor any of its officers knew that loan deeds were executed from Black to Mrs. Mitchell. . . When I took these propositions to the West End Park Company about these two lots, they contained a provision that if Black would build a house they would subordinate the purchase-money loan to a permanent loan to be placed on the house after the house was completed. I did not make any explanation to the West End Park Company about that. . . In other lots which I sold for the West End Park Company the builder operated on practically the same basis; so much cash, and then subordinate back of the first loan. . . Whether I was present at any time when the down payment of $250 was made by Black to the West End Park Company on these lots, I could not say that I was; I do not remember it. . . I do not remember what form the payment took; whether cash or in check. . . Now, after the West End Park Company signed these contracts agreeing to sell to Black on the basis that I drew up there, I do not know that he made an application to Mrs. Ella Mitchell, through Mr. Jackson, for a pay-roll loan of $2500 on each lot. After the contracts were signed, Black, I think, requested me to carry a copy to Mr. Jackson's office. I did not discuss or know the purpose for which I was carrying those contracts to Mr. Jackson's office. I did not discuss the matter with Mr. Jackson. . . It is true that F. T. & George J. Morris sold some vacant lots on Stillwood Drive within the two months immediately preceding this transaction on this second-mortgage plan, and that in every one of them Mrs. Mitchell made the pay-roll loan, and that they were closed by the representative of F. T. & George J. Morris as the real-estate agents. . . They sold some lots on which Mrs. Ella Mitchell made the pay-roll loans. . . I did not know how Black intended to finance these houses that he proposed to build on each one of these lots. All my dealings with the West End Park Company about this Black proposition were carried on through Mr. George Campbell, I think. I did not have any conversation or any transaction with anybody else but him. . . When I say that I do not know they were informed about the way Black intended to finance these houses and about Mrs.

Ella Mitchell's loan, I mean that they did not know, as far as I know—so far as my telling them. I don't know what they learned from other sources."

William J. Davis, for the defendant, testified: "I am president of the West End Park Company, and was in January 1929." Q. "When Mr. Everett brought in his proposition for the sale of these lots, what happened then?" A. "They were brought to me by Mr. Campbell, the secretary of the company; and so I read them and authorized the details under which the West End Park Company sells lots. There was no other conversation had between me and Mr. Campbell with reference to these contracts of sale of these lots. I did not have any conversation with reference to these lots with Mrs. W. J. Mitchell at any time before the loan was finally closed up and the purchase-money paid. . . I did not have any conversation in connection with the loan deeds which we took on these lots, with her attorney, Mr. E. G. Jackson, nor with anybody, other than the conversation that I have referred to with Mr. Campbell. If any conversation was had between Mr. Jackson, Mrs. Mitchell, or Mr. Mitchell with George Campbell about these lots, it was not reported to me. I did not authorize or instruct Mr. Campbell or any one else to in any way change or alter the terms of the loan deed which was prepared for Black's signature, or to make any agreement with Mrs. Mitchell or her husband or her attorney, Mr. Jackson, by which the first lien of the West End Park Company would be waived or in any way subject to her loan. The directors of the company never took any action whatsoever authorizing the secretary to waive the rights acquired under the loan deed of Black to the West End Park Land Co. I did not know, at the time this trade was finally consummated and the purchase-money paid to the West End Park Land Co., that Black borrowed money from Mrs. Mitchell. . . I transacted the actual business of the corporation—the actual work. Most of the actual details, the closing of transactions and the carrying out of trades, the Title Company generally does, or the officers of the Title Company. Some of my officers are officers of the Title Company. Mr. Campbell signs a great many of the sales contracts for West End Park Co., but they always have to have my authority first. They get my authority, and I authorize the sale; he signs up the papers sometimes; sometimes he does not. I sign them the majority of the time. And sometimes he signs deeds as well as sales

agreements. . . When I provided in my loan deed that our first note did not become due for three months, I did not know that Mrs. Mitchell had loan deeds for pay-roll loans that became due within three months. I had never heard of Mrs. Mitchell or any pay-roll loans, or anything like that, until this suit was brought. . . The cash payment of $250 on each lot would have gone through the bookkeeper of the Title Company or through Mr. Campbell. I have never seen those checks at all. . ."

Q. "Has anybody down there got authority from the West End Park Co. to receive money and put your indorsement on checks?" A. "Oh, yes, the bookkeeper has for the Title Company. He attends to my business for me and deposits it. He receives the money for me." Q. "After checks were received by some official of the West End Park Co. from the sale of their lots, what would happen to them—could they be deposited to your account?" A. "They would be deposited to my personal account." Q. "These checks dated January 16, 1929, in the sum of $250, signed by Mrs. Ella Mitchell and made payable to Elvy Black, indorsed 'Pay to the order West End Park Co.,' and indorsed by William J. Davis: did you ever see those checks?" A. "No, I never saw those checks. Those checks were perhaps given to the bookkeeper of the Title Company, and the bookkeeper ran them through my account. That indorsement was authorized; it is a stamp indorsement; but he would pay no attention to whose check it was. He might have borrowed the money from somebody else on another piece of property. They were accepted by the West End Park Co. as cash payment on those two lots, I suppose. I have never seen them before, and could not tell you. I am the owner of the West End Park Co., and owned all the stock in it, and so in that way it would naturally come through my account. I do not know who placed on the back of those checks, at the top, 'Pay to the order of the West End Park Co.'"

Mrs. Ella Mitchell testified: "At the time I took two loan deeds from Elvy Black in January, 1929, I did not talk to Mr. W. J. Davis, the president of the West End Park Land Co., nor tell him I was going to make those loans. I did not talk to any officer of the West End Park Land Co. at that time. In this transaction with Mr. Black, Mr. E. G. Jackson represented me. . . Now, these loans that I made of $2500 on each lot, that money was paid out by me in payment of claims for labor and material in building the

houses out there on the lots described in the loan deeds. I paid that money out personally. No proposition was ever made to me, prior to the time I made those loans, that it would be anything but a first loan on the property; the first loan was my impression all the way through that there was no other loan on the property ahead of mine. My notes and loan deeds of $2500 each from Elvy Black were paid by the Credit Investment Corporation through Mr. C. L. Padgett. As a part of the agreement under which they paid me [for] those loan deeds and bought them from me, I transferred all my rights, title, and interest to Mr. Padgett's company, and it was provided that this litigation, or any litigation connected with these notes and loan deeds, whether a pending litigation or any further litigation, would be conducted in my name for its use and benefit." Counsel for Mrs. Mitchell tendered the two checks of $250 each, signed by Mrs. Ella Mitchell, in favor of Elvy Black, one reciting that it is on lot 27, Block M, South Gordon Street, the other reciting it is for lot 26, of same block and street, both indorsed by Elvy Black to West End Park Co., indorsed by West End Park Co. to W. J. Davis and deposited to his credit in Atlanta & Lowry National Bank, January 18, 1929.

E. G. Jackson testified: "As I recall it, Mr. Everett first came to me and brought me the sales contract between the West End Park Co. and Black for the purchase of two lots, and stated to me that Mr. Black had made application to Mrs. Ella Mitchell for a pay-roll loan, and that Mrs. Mitchell would get in touch with me. Well, I immediately called Mrs. Mitchell; as I recall it, I talked to Mr. Mitchell about it; and he told me to go ahead and examine the title. When I saw it was West End Park, I went down to the Title Company and saw Mr. Campbell about it; told Mr. Campbell what I had in mind, that I was checking the title, and I wanted to know —they were down there in the Title Company, and West End Park, as I understand, was owned by the Title Company. Of course, I did not know, and told him what I was doing, that I was checking it for the purpose of placing a pay-roll loan in favor of Mrs. Ella Mitchell; and he told me that the title was all right, vested in the West End Park Company, and I came down to the court-house, and I think I got a report from Mr. Campbell showing that the taxes had been paid. . . I had had several transactions like that with F. T. & George J. Morris, and the salesmen who make the sales

usually take it up with me, and then I get in touch with Mrs. Mitchell. The arrangements are all made with Mr. Mitchell, before I ever get hold of it at all, because everything is arranged before I begin to check the title. And when I got through checking the title and told Mr. Campbell I was ready, I got the loan deed from Elvy Black to West End Park for the balance of the purchase-money and carried it to my office, and it was executed in my office at the same time the loan deed from Elvy Black to Mrs. Mitchell was. My stenographer—I think it was Miss Helen Yoman—at the time witnessed the West End Park loan deeds and also Mrs. Mitchell's deeds. When the thing was closed up, I obtained a check for $250 on each lot from Mrs. Ella Mitchell, and carried the checks and the deeds down to Mr. Campbell at the Title Company and got the warranty deeds to Black, and carried the warranty deeds and the loan deeds from Black to Mrs. Mitchell down and had it recorded in the clerk's office. . . I had those loan deeds to West End Park Co. in my office at the same time he executed the loan deeds to Mrs. Ella Mitchell. When I went to Mr. Campbell's office just before I began to check the title, I told him what Black proposed to do; we discussed that; and Mr. Campbell discussed with me about the buying of the materials; and I told him what I had done—that I had gone down and talked with Mr. Creel, who was to furnish the material."

Q. "Did you or not tell him that Mrs. Mitchell was making a pay-roll loan on those two lots of $2500 each?" A. "Yes, that I would get a check for $250 from Mrs. Mitchell to make the cash payment on the lots. I do not recall that I told him that Mrs. Mitchell's loan deeds matured in three months time. I do not recall whether I showed him the loan deeds from Black to Mrs. Mitchell before the trade was actually closed by the payment of the cash payment to the West End Park Co. and the delivery to me of Black's warranty deed. It was discussed there two or three times, in Mr. Campbell's office." Q. "State whether or not, as a result of your conversation and negotiations, at the time you spoke of, you understood that Mrs. Mitchell's loan deeds were to be paid —if it was stated—did you state to Mr. Campbell that Mrs. Mitchell's loan deeds were to be paid off by Black in the end, when he got his permanent loan, provided for in the sales contract and in the loan deed from Black to West End Park?" A. "Yes, that was discussed, relative to the subordination of Mr. Campbell's claim for

the balance of the purchase-price after the permanent loan of sixty per cent. was placed. . . That was discussed in the office. . . The West End Park Co. did not turn over their warranty deed to Black, or to be recorded in Black's name, before I delivered those checks of Mrs. Mitchell's for the cash payment. I got the warranty deed at the same time I delivered the check. . . When I received the West End Park Company's loan deeds for the purpose of having Black to execute them, they were already completed and filled out—all that was lacking was the signature. I made no additions or changes in them. I stated that Mrs. Mitchell expected to get her money out of the permanent loan when it was placed; that is, the loan that they had agreed to subordinate. I don't recall whether it was discussed as to when our note became due. . . I knew, when Black signed the loan deeds to West End Park in my office, that they were purchase-money security deeds. There was no discussion as to which was to have priority, no discussion about that at all. No statement that Mrs. Mitchell considered her deed to be superior to that of the Park Company. . . We had a somewhat similar transaction to this on another lot in West End Park for one E. D. Paxon about a year ahead of this." Q. "I show you a certified copy of a loan deed from E. D. Paxon to Mrs. Ella Mitchell, dated on the 6th day of January, 1928, which appeared to have been witnessed by Eugene L. Miller and E. G. Jackson, and recorded in deed book 1127, page 52. Look over that and refresh your recollection." A. "I recall that we did make a loan to E. D. Paxon. . . It was a West End Park lot too. I don't recall whether that loan was handled in exactly the same way as this one. I will have to see what the stipulations are in the deed." Q. "I show you a certified copy of a loan deed from E. D. Paxon to West End Park Co., covering the same lots, and also witnessed by you and Greer C. Roberts. Look over those two deeds and see if they represent the transactions with Paxon and Mrs. Mitchell?" A. "This purchase-money security deed from Paxon to West End Park Co. seems to have the same stipulations as in the Black deed. Now, this other one, this deed from Paxon to Mrs. Mitchell, seems to have been made subject to a purchase-money deed in favor of West End Park. Those two deeds represented the transaction between Paxon and West End Park, and Paxon and Mrs. Mitchell.

Q. "And you were representing Mrs. Mitchell in that transac-

624

tion, just in the same way you represented her in the Elvy Black
transaction, did you not?" A. "No; about a year before, they were
making loans on a second mortgage. They instructed me not to
make any more loans on a second mortgage. She told me not to
put into any deed, after that, that it was subject to another deed. I
stated just now that I did not tell the West End Park Co. that I
thought that Mrs. Mitchell had the first lien on the property out
there by her loan deed, and that the matter was not discussed.
They did not suggest that they were ahead of Mrs. Mitchell either."

George A. Campbell, in rebuttal, testified: "In January, 1929,
I was the secretary of the West End Park Company. When Mr.
Everett, of the Morris Company, brought me a signed proposal
from Elvy Black for these lots, I submitted it to Mr. Davis, got his
approval on it, and after he did approve it I signed it and gave it
back to Mr. Everett, and kept one copy for our file. I did not have
any conversation with Mrs. Ella Mitchell or with her husband, M.
J. Mitchell, with reference to Mrs. Mitchell making some loans on
this property. The only conversation I had with Mr. Jackson, her
attorney, was after the deal had been closed and the papers had
been signed, and I happened to be coming to the court-house at
that time, and brought the papers to file them for record; and when
I got to the clerk's office Mr. Jackson was there, and he made the
statement that he had beat me to the record. I said, 'What do you
mean?' He said, 'I have filed my deed ahead of yours.' I said,
'What deed do you have reference to?' He said, 'The deed from
Black to Mrs. Mitchell.' I do not recall whether Mr. Jackson came
by our office and had a conversation with me at the time of this
Elvy Black transaction about his examining the title for the loan
of Mrs. Mitchell."

Counsel for Mrs. Mitchell then introduced the two original pur-
chase-money security deeds from Elvy Black to West End Park Co.;
dated January 10, 1929, also the two original security deeds from
Black to Ella Mitchell, dated January 16, 1929, both filed for record
January 16, 1929, being the same deeds referred to and described in
the agreed statement read in evidence.

Counsel for the West End Park Company then read into the evi-
dence paragraph 5 from the original bill filed by Long in this case,
as follows: "Your petitioner shows that the defendant, Elvy
Black, has undertaken to improve said property by the erection of

two six-room brick-veneer bungalows, which houses are now in a partially complete state, and that defendant Black has been unable to obtain the necessary materials to continue building said houses, and the same have been abandoned and are now lying in an uncomplete state." Also, the following from an amendment filed by the plaintiffs on June 18, 1929, in paragraph 4, as follows: "Plaintiffs say that the property and real estate consist in two unfinished houses, a house being on each lot, and that the same is deteriorating in value; and that the best interests of all parties will best be served by an immediate sale of the property described in the original petition."

The court, on motion directed a verdict in favor of Mrs. Mitchell. The West End Park Company did not move for a new trial, but brought the case to this court by direct bill of exceptions. The first assignment of error is on the admission in evidence, over the objections stated, of the agreed statement heretofore quoted. In the second and third assignments complaint is made of the direction of the verdict. The fourth exception complains of the ruling excluding from evidence testimony of E. G. Jackson, as follows: While Jackson was on the stand, and after he had testified that West End Park Company had previously sold a lot to E. D. Paxon, on which Mrs. Mitchell had made a pay-roll loan, and had identified the purchase-money security deed from Paxon to the West End Park Co., and the pay-roll loan deed from Paxon to Mrs. Mitchell, and had further stated that at the time of the Paxon loan, which was about one year before the Elvy Black loan, Mrs. Mitchell made second mortgages, but that after the Paxon loan she had instructed her attorney not to make any more loans on second mortgages, and that "she instructed me not to put into any deed, after that, that it was subject to another deed, the witness was then asked the following question: "Did you ever advise West End Park Company that you were under these instructions?" To which question he answered: "No, sir, I did not tell them." This question and answer were objected to on the ground that "it was not his duty to tell the West End Park Company anything; it was their duty to inquire." The court sustained the objection and ruled out the question and answer. The fifth assignment is that the court erred in excluding from evidence the two loan deeds from Paxon to Mrs. Mitchell, which were offered as illustrating prior transactions between Mrs. Mitch-

ell and the West End Park Company and the way in which she handled loans and property sold by the West End Park Company. Counsel for Mrs. Mitchell objected on the ground that they were immaterial and irrelevant, and that one transaction would not indicate a course of dealing, and that it was the duty of the West End Park Company to ascertain what the procedure was. This objection was sustained.

■ The court did not err in admitting in evidence a portion of an alleged agreed statement of facts. This extract from the agreed brief of evidence had been considered and approved by the court as a part of the evidence upon the former trial between the same parties, in which were presented the same issues as are involved in the present adjudication. The objections offered were, that said paper was not an agreed statement of facts; that it was never contemplated to be used in a jury trial; that, properly construed, it had nothing to do with this case at the time, as it was merely for temporary use to go to the Supreme Court; that it was prepared by attorneys for Mrs. Mitchell, and if there were any doubt of its meaning it should be construed against her; that it was not intended as an ultimate statement of facts, but merely as a statement of the evidence that had been introduced in the former trial.

■ The entry of a judgment after the direction of a verdict by the court is harmless in cases where the verdict is set aside, in which case the judgment becomes functus officio.

■ In the fourth assignment of error complaint is made that the court erred in excluding certain testimony to the effect that in a previous course of dealing Mrs. Mitchell had been accustomed to take security for loans advanced by her, subject and inferior to the deeds by which the West End Park Company was secured in the collection of purchase-money for its lots, and that, not having been informed that Mrs. Mitchell had adopted a new course of procedure, it was thereby misled to its injury. The fifth assignment of error complains of the exclusion by the court from evidence of certain deeds offered in connection with the testimony above referred to. These objections are without merit, especially in view of the evidence that the deeds in this particular instance (and with these alone could the court be concerned) from Black to the West End Park Company were delivered by Mr. Campbell, the secretary of the company, to Mr. Jackson, the attorney representing Mrs. Mitch-

ell, who secured their execution by Black at the same time Black signed the loan deeds to Mrs. Mitchell, and the undisputed testimony of Jackson that he had previously informed Campbell that Mrs. Mitchell was going to make the pay-roll loans to Black, and that out of the proceeds of these loans the company would be paid the initial installment of $250 on each of the lots sold to Black. In the circumstances disclosed by the record it was competent for Mrs. Mitchell to show that in this instance she had adopted a different method of conducting her business. Nor did she owe any duty to the defendant to inform it that she had changed her mode of operation.

■ The court erred in directing a verdict in favor of the plaintiff, because there were issues of fact which should have been submitted to the jury. The evidence did not demand the verdict which the court directed the jury to find.

*Judgment reversed. All the Justices concur.*